THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICHAEL GOUGH and CONSTANCE
GOUGH,

                 Plaintiffs,

    v.

PEACEHEALTH ST. JOSEPH MEDICAL
CENTER,

               Defendant.

CASE No. 2:12-cv-00346-RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on Defendant PeaceHealth[1] St. Joseph Medical Center's ("St. Joseph") Motion for Partial Summary Judgment. Dkt. # 14. St. Joseph moves the court for an order granting partial summary judgment on Michael W. Gough's ("Mr. Gough") and Constance G. Gough's ("Ms. Gough") (collectively, "Plaintiffs") claim for violation of the Americans with Disabilities Act ("ADA") and Ms. Gough's claim under the Washington Law Against Discrimination ("WLAD").[2] *Id.* Plaintiffs filed

---

[1] In this order, the court has used the correct spelling of Defendant's corporate name, as identified by Plaintiffs in the complaint. Dkt. # 1, ¶ 3.

[2] St. Joseph's only basis for dismissal of Mr. Gough's WLAD claim is that the court should decline to exercise supplemental jurisdiction over this claim after the court grants dismissal of

1    suit alleging that St. Joseph violated the anti-discrimination law by failing to provide

2    qualified interpreters necessary for the effective communication with St. Joseph's

3    medical personnel for the bulk of Mr. Gough's stay and, thus, denying Plaintiffs the

4    benefit of meaningful participation in the medical treatment. Dkt. # 1.  St. Joseph argues

5    that the suit should be dismissed because it complied with both the ADA and the WLAD

6    as a matter of law, and because Plaintiffs failed to show any recoverable damages. Dkt. #

7    14.

8         Having considered the memoranda, evidence,[3] and the record herein, the court

9    DENIES Defendant's motion for partial summary judgment for the reasons stated below.

10                        **II. BACKGROUND[4]**

11        Plaintiffs, husband and wife, are deaf individuals who communicate primarily

12   through American Sign Language (ASL).[5]  Dkt. # 18 at 4.  On June 14, 2011, at 6:30

13   p.m., Mr. Gough, accompanied by Ms. Gough, went to St. Joseph's emergency room

14   seeking medical attention for chest pain and shortness of breath. Dkt. # 15 (Ex. 1 to Aye

15   Decl., Mr. Gough Dep. 15:23-16:7).  Upon arrival, at the front desk, Mr. Gough wrote a

16   note requesting an ASL interpreter in order to communicate effectively with St. Joseph's

17   medical personnel, but an interpreter was not provided at that time.[6] Dkt. # 15 (Ex. 1 to

18   Aye Decl., Mr. Gough Dep. 16:14-17:19).  During the admission process and initial

19   medical evaluation, Mr. Gough and St. Joseph's medical personnel communicated by

20   passing notes back and forth. *Id.*  After the initial evaluation, the cardiologist informed

21   _____

22   Plaintiffs' ADA claim. Dkt. # 14 at 5.  Since the court does not dismiss the ADA claim, this
     argument is moot.

23   [3] The second declaration of Ms. Gough has not been executed, and is therefore inadmissible.
     Dkt. # 24.

24   [4] The material facts are not in dispute. Dkt. # 18 at 2.

25   [5] In his deposition, Mr. Gough testified that due to English being his partially-learned second
     language and due to ASL's own unique grammar, he finds it difficult to communicate through a

26   written word, but is capable of writing and understanding simple notes outside of an emergency
     situation. Dkt. # 15 (Ex. 1 to Aye Decl., Mr. Gough Dep. 9:8-14:13, Sept. 11, 2012).

27   [6] St. Joseph indicated that at the time Mr. Gough was a patient, it was difficult to obtain a same-
     day interpreter." *See* Dkt. # 15 (Ex. 6 to Aye Decl., Allard Mem.).

Mr. Gough that he suffered a mild heart attack and needed to be admitted to St. Joseph. Dkt. # 15 (Ex. 1 to Aye Decl., Mr. Gough Dep. 19:3-6). At that time, Mr. Gough again requested interpreter services and supplied the cardiologist with the name of a certified ASL interpreter Mr. Gough utilized in the past. *Id.* An interpreter was not provided. Dkt. # 15 (Ex. 1 to Aye Decl., Mr. Gough Dep. 19:7-16). St. Joseph obtained Mr. Gough's signature on the form consenting to Mr. Gough's medical evaluation, testing, and treatment. Dkt. # 15 (Ex. 2 to Aye Decl.). Mr. Gough contends that this was done without any explanation and "in a rush." Dkt. # 15 (Ex. 1 to Aye Decl., Mr. Gough Dep. 38:23).

On June 15, 2011, at approximately 3:00 a.m., Mr. Gough signed the consent form authorizing St. Joseph to perform the cardiac catheterization procedure. Dkt. # 15 (Ex. 1 to Aye Decl., Mr. Gough Dep. 39:7-11). Again, no interpreter had been provided.[7] Although the consent form stated that "[y]our Cardiologist … has discussed Cardiac Catheterization with you" and "has answered my questions," Mr. Gough testified that he does not recall anyone discussing the form or the procedure with him.[8] Dkt. # 15 (Ex. 1 to Aye Decl., Mr. Gough Dep. 39:12-40:5).

At approximately 7:30 a.m., Mr. Gough underwent a catheterization procedure due to the heart condition St. Joseph had earlier detected. According to Mr. Gough, by this time, he "was just so worried" because "there was no interpreter and [he] still wasn't able to communicate." Dkt. # 15 (Ex. 1 to Aye Decl., Mr. Gough Dep. 19:17-22). Mr. Gough submits that, in addition to not fully understanding his diagnosis, he could not understand

---

[7] Ms. Gough testified that on the night before the procedure she also requested interpreter services from St. Joseph. Dkt. # 15 (Ex. 4 to Aye Decl., Ms. Gough Dep. 7:14-25, Sept. 11, 2012).

[8] The signature of the health care provider indicating that the provider "ha[s] explained the risks, benefits, alternatives, and nature of this procedure" to Mr. Gough is not in the record. *See* Dkt. # 15 (Ex. 3 to Aye Decl., Consent Form).

the nurses' instructions and the procedure he was about to undergo.[9] Dkt. # 15 (Ex. 1 to Aye Decl., Mr. Gough Dep. 20:5-21).

Following his operation, Mr. Gough was moved to a recovery room where St. Joseph's medical staff allegedly worked on Mr. Gough without any attempts to communicate regarding his on-going medical treatment.[10]  The first time St. Joseph provided a sign language interpreter was approximately 21 hours after the first request. Plaintiffs do not dispute that an interpreter was provided "for about two hours" following the procedure, at approximately 3:00 p.m.  Dkt. # 18 at 2.  At that time, Plaintiffs had a brief meeting with the surgeon, who informed Mr. Gough that a stent was placed in his heart. Dkt. # 15 (Ex. 1 to Aye Decl., Mr. Gough Dep. 23:1-3).  Thereafter, Mr. Gough was not provided another interpreter.  Mr. Gough testified that both before and after the interpreter was present, St. Joseph's medical staff administered medicine and conducted testing without any attempts to communicate with him. *Id*. (Mr. Gough Dep. 23:14-21).

On June 16, 2011, Mr. Gough was discharged from St. Joseph.  However, no qualified sign language interpreter was provided by St. Joseph.  Rather, a friend of Plaintiffs who happened to be at St. Joseph volunteered as an interpreter. *Id*. (Mr. Gough Dep. 23:22-24:20).  During the discharge procedure, Plaintiffs met with the cardiologist and inquired regarding Mr. Gough's previously-scheduled unrelated surgery. *Id*.  The cardiologist stated that Mr. Gough could not have the surgery for a year, without further explanation. *Id*.

On September 7, 2011, Mr. Gough filed a complaint with the Washington State Human Rights Commission (the "HRC") alleging discrimination by St. Joseph on the

---

[9] Ms. Gough also testified that she felt uninformed about her husband's medical condition due to St. Joseph's ineffective communication with her. Dkt. # 15 (Ex. 4 to Aye Decl., Ms. Gough Dep. 9:20-10:4).

[10] Mr. Gough testified that "nurses would come in and push on me and onto my – on my groin on my leg where they inserted … a catheter. … And again they're not communicating with me. They're just coming in and doing stuff to me." Dkt. # 15 (Ex. 1 to Aye Decl., Mr. Gough Dep. 22:8-13).

basis of his hearing disability. Dkt. # 15 (Ex. 5 to Aye Decl.).  On January 17, 2012,
following the investigation, the HRC found that St. Joseph "took immediate corrective
action to make sure it is in compliance with the law." Dkt. # 15 (Ex. 6 to Aye Decl.,
Investigative Finding/Closure Recommendation).  The investigator for the HRC indicated
that St. Joseph "has set up a Skype[11] program that will assure 24/7 access to interpreters
for its clients" and "immediately conducted training … on the assistive devices." Dkt. #
15 (Ex. 6 to Aye Decl., Allard Mem.).  On January 27, 2012, the HRC officially closed
Mr. Gough's case stating that the matter has been resolved. Dkt. # 15 (Ex. 7 to Aye Decl.,
Notice of Commission Action).

### III. ANALYSIS

Summary judgment is appropriate if there is no genuine dispute as to any material
fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.
56(a).  The moving party bears the initial burden of demonstrating the absence of a
genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
Where the moving party will have the burden of proof at trial, it must affirmatively
demonstrate that no reasonable trier of fact could find other than for the moving party.
*Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).  On an issue where the
nonmoving party will bear the burden of proof at trial, the moving party can prevail
merely by pointing out to the district court that there is an absence of evidence to support
the non-moving party's case.  *Celotex Corp.*, 477 U.S. at 325.  If the moving party meets
the initial burden, the opposing party must set forth specific facts showing that there is a
genuine issue of fact for trial in order to defeat the motion.  *Anderson v. Liberty Lobby,*

---

[11] Skype[TM] is a text, voice, and video conferencing technology that can be utilized as a video
remote interpreting ("VRI") service allowing a deaf patient to communicate with a health care
provider via a sign language interpreter at a remote location.  While viewing each other on
respective computer monitors, the deaf patient and the interpreter sign to a video camera
mounted on top of the monitors.  The interpreter voices what has been signed to the health care
provider and signs the response viewable in the monitor by the deaf patient.

1  *Inc.*, 477 U.S. 242, 250 (1986).  The court must view the evidence in the light most

2  favorable to the nonmoving party and draw all reasonable inferences in that party's favor.

3  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).  If different ultimate

4  inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co.*

5  *of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

6  **A.      Plaintiffs' Motion for Extension of Time**

7           Plaintiffs' attorney filed their opposing memorandum, along with a motion to

8  accept the late filing, on November 12, 2012, three days past the deadline, citing health

9  reasons as the cause for the delay. Dkt. ## 18, 19.  Prior to the deadline, Plaintiffs'

10 attorney sought a stipulation to a one-week extension to file the opposition from St.

11 Josephs' counsel, but counsel refused to so stipulate.  Dkt. # 21 at 2.

12          Under Federal Rule of Civil Procedure 6(b), "the court may, for good cause,

13 extend the time … on motion made after the time has expired if the party failed to act

14 because of excusable neglect." Fed. R. Civ. P 6(b)(1)(B).  In determining whether neglect

15 is excusable, the court considers: (1) the danger of prejudice to the opposing party; (2) the

16 length of the delay and its potential impact on the proceedings; (3) the reason for the

17 delay, including whether it was within the reasonable control of the movant; and (4)

18 whether the movant acted in good faith. *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd.*

19 *P'ship*, 507 U.S. 380, 395 (1993).

20          Here, the court finds that there is no prejudice to St. Joseph because the delay did

21 not prevent St. Joseph from filing a reply or prevent this court from considering it.  In

22 addition, the court's striking the trial date and pre-trial deadlines in light of St. Joseph's

23 summary judgment motion will secure additional time and ease the parties' calendaring

24 demands.  The court also finds that a mere three-day delay does not justify denying relief,

25 and that health reasons constitute an intervening circumstance beyond Plaintiffs' attorney

26 control.  Finally, Plaintiffs' attorney has acted in good faith by attempting to seek an

27 extension of time prior to the deadline for filing the opposition.  Therefore, the court

1    concludes that Plaintiffs' neglect was excusable.  Accordingly, Plaintiffs' motion to

2    accept the late-filed opposition is GRANTED.

3    **B.      Standing**

4            Disabled individuals claiming discrimination must satisfy the case or controversy

5    requirement of Article III by demonstrating their standing to sue at each stage of the

6    litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  To satisfy Article III

7    standing, Plaintiffs must demonstrate that (1) they suffered an injury in fact; (2) the injury

8    is traceable to St. Joseph's actions; and (3) the injury can be redressed by a favorable

9    decision.[12] *Lujan*, 504 U.S. at 560-61.  In addition, to pursue injunctive relief, Plaintiffs

10   must demonstrate a "real and immediate threat of repeated injury." *O'Shea v. Littleton*,

11   414 U.S. 488, 496 (1974).  "Past exposure to illegal conduct does not in itself show a

12   present case or controversy regarding injunctive relief … if unaccompanied by any

13   continuing, present adverse effects." *Id*. at 496.  The Supreme Court has instructed the

14   courts to take a broad view of constitutional standing in civil rights cases, especially

15   where, as under the ADA, private enforcement suits are the primary method of obtaining

16   compliance with the Act. *Doran v. 7-Eleven, Inc*., 524 F.3d 1034, 1039 (9th Cir. 2008)

17   (internal quotations omitted).

18       1.   Plaintiffs' Standing

19           Standing "often turns on the nature and source of the claim asserted." *Warth v.

20   Seldin*, 422 U.S. 490, 500 (1975).  In this case, Plaintiffs' standing turns on the nature and

21   source of their hearing disability discrimination claim under Title III of the ADA.  Title

22   III prohibits from discriminating "on the basis of disability *in the full and equal*

23   *enjoyment* of the goods, services, facilities, privileges, advantages, or accommodations"

24   that St. Joseph offers. 42 U.S.C. § 12182(a) (emphasis added).[13]  Under the ADA, when a

25

26   [12] The causation element is not at issue here.

27   [13] Under Title III, money damages are not available to private plaintiffs, but the statute allows for
     injunctive relief. 42 U.S.C. § 12188.

1    disabled person encounters a communication barrier in violation of the statute, it is not

2    necessary for standing purposes that this communication barrier completely preclude the

3    plaintiff from obtaining a service or from using a facility. *See Chapman v. Pier 1 Imports*

4    *(U.S.) Inc*., 631 F.3d 939, 947 (9th Cir. 2011) (addressing accessibility barriers).  Rather,

5    the communication barrier need only interfere with the plaintiff's "full and equal

6    enjoyment" of the facility or service it offers. *Id.*

7              a.  *Injury in Fact*

8         Following this principle, to constitute an injury in fact linked to Plaintiffs'

9    disability, Plaintiffs must demonstrate that St. Joseph's alleged failure to provide an

10   interpreter for the bulk of Mr. Gough's stay interfered with their "full and equal

11   enjoyment" of the medical treatment at St. Joseph, making Plaintiffs' use of the hospital

12   more difficult than for non-deaf individuals.  Plaintiffs presented evidence that, due to

13   their hearing disability and St. Joseph's failure to timely provide an interpreter, Plaintiffs

14   did not have "a complete picture" of Mr. Gough's medical treatment. Dkt. # 23 (Mr.

15   Gough Decl.) at 2:15-17.  Plaintiffs have shown that, on account of their hearing

16   disability, they were denied the opportunity to ask questions regarding the procedure, the

17   results of the procedure, symptoms, and recovery. Dkt. # 15 (Ex. 1 to Aye Decl., Mr.

18   Gough Dep. at 16:12-20:25, 21:17-18, 24:14-25:18, 26:5-8, 28:2-6; Ex. 2 to Aye Decl.,

19   Ms. Gough Dep. at 11:17-12:11).  In addition, Plaintiffs presented evidence that they

20   were effectively excluded from giving informed consent, and that St. Joseph's alleged

21   violations prevented Plaintiffs from gaining the same benefit of the medical treatment

22   that non-deaf individuals at St. Joseph would enjoy.  Accordingly, the court finds that

23   Plaintiffs sufficiently demonstrated an injury in fact for standing purposes.

24             b.  *Redressability*

25        St. Joseph next appears to argue that Plaintiffs' injury is not redressable by a

26   favorable decision of this court because the injury is not particular to Plaintiffs. Dkt. # 25

27

1  at 5.  St. Joseph is mistaken.[14]  The only relevant question regarding redressability is

2  whether the court "posses[es] the ability to remedy the harm that [Plaintiffs] assert." *Nat'l*

3  *Wildlife Fed'n v. FEMA*, 345 F. Supp. 2d 1151, 1165 (W.D. Wash. 2004).  Here, if the

4  violation of the ADA is found, the court has the authority to issue appropriate relief. 42

5  U.S.C. § 12188(a)(2); *see also Lewis v. Casey*, 518 U.S. 343, 349 (1996) ("It is the role

6  of courts to provide relief to claimants ... who have suffered, or will imminently suffer,

7  actual harm....").  This is sufficient for standing.

8          *c.  Real and Immediate Threat of Repeated Injury*

9       "[A]n ADA plaintiff can show a likelihood of future injury when he intends to

10 return to a noncompliant accommodation and is therefore likely to [suffer repeated

11 injury]." *Chapman*, 631 F.3d at 950.  Here, Plaintiffs furnished sufficient evidence to

12 create a triable issue regarding St. Joseph's ongoing noncompliance.  Mr. Gough submits

13 that, while at St. Joseph, he has tried to use the VRI twice but could not see the monitor

14 from his lying-down position, the video was "blurry," and "it took too long" for St.

15 Joseph's staff to set up the device. Dkt. # 23 (Mr. Gough Decl.) at 3:14-16.  Plaintiffs

16 also have shown that despite their repeated requests, St. Joseph failed to provide a live,

17 on-site ASL interpreter, and that it is likely that St. Joseph will continue to deny such

18 services despite their availability. Dkt. # 15 (Ex. 1 to Aye Decl, Mr. Gough Dep. at

19 16:12-18, 20:22-25, 37:13); # 23 (Mr. Gough Decl.) at 3:4-4:3.  In addition, Plaintiffs

20 have presented evidence that they will visit St. Joseph in the near future because it is the

21 only hospital in their geographic area. *Id.* at 3:18-4:3.  This showing is bolstered by the

22 fact that Mr. Gough visited St. Joseph on multiple occasions since his June 2011

23 hospitalization. *See* Dkt. # 15 (Ex. 1 to Mr. Gough Dep. at 40:15-41:9; # 23 (Mr. Gough

24

25 [14] It appears that St. Joseph had conflated redressability with immediate threat of future harm.
   The court notes, however, that because Plaintiffs sufficiently showed "a distinct and palpable
26 injury" to themselves, Plaintiffs may seek relief on the basis of the legal rights and interests of
   others and may invoke the general public interest in support of their claim. *Sierra Club v.*
27 *Morton*, 405 U.S. 727, 737 (1972).

Decl.) at 3:4-8.  Accordingly, given the fact that Plaintiffs seek to enjoin what they claim is an existing unfair policy and practice, the court finds that Plaintiffs have sufficiently demonstrated a "real and immediate threat of future injury." *See, e.g., Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 306 (1st Cir. 2003) ("To sum up, the question before us is whether Dudley has proffered enough evidence to establish a real and immediate threat that Hannaford's policy will again result in a Title III violation.  Given the remedial purpose underlying the ADA, courts should resolve doubts about such questions in favor of disabled individuals.").

Accordingly, the court finds that Plaintiffs have standing to seek injunctive relief under the ADA.

2.  Ms. Gough's Standing

St. Joseph also challenges Ms. Gough's standing by arguing that the ADA and the WLAD do not impose a duty on a hospital to provide accommodations to a family member who is not seeking health care. Dkt. # 14 at 11.  St. Joseph is mistaken.  The actual or threatened injury required by Article III may exist solely by virtue of a statute that creates legal rights, the invasion of which creates standing. *Warth*, 422 U.S. at 500; *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.").

The ADA's implementing regulations, promulgated by the Department of Justice, mandate that:

> A public accommodation *shall* furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities.  This includes *an obligation* to provide effective communication to *companions who are individuals with disabilities*.

28 CFR § 36.303(c)(1) (emphasis added).  "Companion" is defined, in part, as:

> [A] family member … of an individual seeking access to, or participating in, the … services, facilities, privileges, advantages, or accommodations of a public accommodation, who, along with such individual, is an appropriate person with whom the public accommodation should communicate.

ORDER - 10

1    28 CFR § 36.303(c)(1)(i).  "As the agency directed by Congress to issue implementing

2    regulations, to … [explain] the responsibilities of covered individuals and institutions,

3    and to enforce [the ADA] in court, the Department's views are entitled to deference."

4    *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998).  "If Congress has explicitly … delegate[ed]

5    … authority to [an] agency to elucidate a specific provision of the statute by regulation,"

6    such "regulations are given controlling weight unless they are arbitrary, capricious, or

7    manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,*

8    *Inc.*, 467 U.S. 837, 843-44 (1984).

9        Here, Ms. Gough contends that she has standing because her rights are affected by

10    St. Joseph's failure to communicate effectively with her regarding her husband's medical

11    condition and treatment.  The court agrees.  Ms. Gough, the patient's wife and a deaf

12    individual herself, qualifies as a "companion."  Thus, Ms. Gough was entitled to

13    communicate with St. Joseph's medical personnel in a nondiscriminatory manner to

14    meaningfully participate in the decisions affecting both her and her husband.[15]

15        St. Joseph similarly argues that it has no duty to Ms. Gough under the WLAD.

16    Dkt. # 14 at 11.  St. Joseph, however, has not provided the court, and the court is unaware

17    of, any authority supporting such a proposition.  Indeed, the WLAD affords broader

18    scope of protections than Title III of the ADA in that it allows suits for money damages

19    and confers standing to "[a]ny person *deeming* himself or herself injured by any act in

20    violation of [the WLAD]." RCW 49.60.030(2) (emphasis added); *see also Wheeler v.*

21    *Catholic Archdiocese of Seattle* (1992) 65 Wn. App. 552, 829 P.2d 196 (1992), *rev'd on*

22    *other grounds*, 124 Wn. 2d 634, 880 P.2d 29 (1994) (emphasizing that remedial provision

23    of law against discrimination is to be liberally construed in order to encourage private

24

25    ───────────────────

26    [15] St. Joseph's reliance on *Aikins v. St. Helena Hosp*., 843 F. Supp. 1329 (N.D. Cal. 1994), is misplaced.  There, the court held that the wife of a deaf patient did not have standing under the

27    ADA because she did not show an immediate threat of future injury since she only stayed in her mobile home near the hospital several days a year. *Aikins*, 843 F. Supp. at 1333.

1   enforcement).  Thus, following the policy of construing this statute liberally, St. Joseph's

2   argument as to Ms. Gough's lack of standing under the WLAD also fails.

3         Accordingly, the court concludes that Ms. Gough has standing to bring her

4   disability discrimination claims under the ADA and the WLAD.

5   **C.    The ADA and the WLAD Violations**

6         To prove that St. Joseph violated Title III of the ADA, Plaintiffs must demonstrate

7   that (1) Plaintiffs have a disability, (2) St. Joseph is a place of public accommodation, and

8   (3) Plaintiffs were denied full and equal treatment because of their disability. *Paulsen v.*

9   *PS Business Parks, LP*, No. C10–1031 MJP, 2011 WL 3419894, at *4 (W.D. Wash. Aug.

10  4, 2011).  Similarly, the elements of a *prima facie* claim of discrimination in a place of

11  public accommodation under the WLAD are: (1) the plaintiff is disabled; (2) defendant's

12  establishment is a place of public accommodation; (3) disabled persons are not provided

13  services comparable to those provided nondisabled persons by or at the place of public

14  accommodation; and (4) the disability was a substantial factor causing the discrimination.

15  *Fell v. Spokane Transit Auth.*, 128 Wn. 2d 618, 637, 911 P.2d 1319 (1996) (en banc).

16  Because the elements of discrimination under the ADA and the WLAD do not differ in

17  any relevant respects, *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001),

18  the court's analysis in the ADA context equally applies to Plaintiffs' WLAD claim. *See*

19  *also Washington State Communication Access Project v. Regal Cinemas, Inc*., 293 P.3d

20  413, 422 (2013) ("Washington courts may look to Title III of the Americans with

21  Disabilities Act (ADA) and interpretation of that provision as one source of guidance in

22  adjudicating WLAD cases.").

23        Here, St. Joseph does not dispute that Plaintiffs are individuals with a hearing

24  disability or that St. Joseph is a place of public accommodation. Dkt. # 14 at 8.  Instead,

25  St. Joseph argues that it complied with the ADA as a matter of law because Mr. Gough

26  received the exact same benefit of "health care" as its non-disabled patients. *Id*. at 9.  St.

27  Joseph misses the point.  Plaintiffs' claims relate to their exclusion from meaningful

1   participation in the medical treatment, not to the appropriateness of health care provided

2   by St. Joseph.  If health care was all that St. Josephs was required to provide, then the

3   ADA would require very few accommodations.  To comply with Title III, public

4   accommodations must consider how their facilities are used by non-disabled individuals

5   and then take reasonable steps to provide their disabled individuals with a like

6   experience. *Baughman v. Walt Disney World Co*., 685 F.3d 1131 (9th Cir. 2012).  Here,

7   Plaintiffs provided detailed testimony and declarations explaining the difficulties they

8   experienced during Mr. Gough's admission, evaluation, consultation, and other critical

9   points of his medical treatment at St. Joseph.  Plaintiffs have presented evidence that they

10  were unable to understand the medical instructions and to participate in a meaningful

11  dialogue with the health care providers.  From this evidence, a reasonable trier of fact

12  could determine that St. Joseph denied Plaintiffs full and equal treatment because of their

13  hearing disability.

14      St. Joseph also contends that it complied with the ADA as a matter of law because

15  it reasonably communicated with Plaintiffs in writing. Dkt. # 14 at 10.  The regulations

16  implementing Title III of the ADA require places of public accommodation to "furnish

17  appropriate auxiliary aids and services … to ensure *effective communication* with

18  individuals with disabilities." 28 C.F.R. § 36.303(c)(1) (emphasis added).  While "written

19  notes" may qualify as an auxiliary aid or service, 28 C.F.R. § 36.303(b)(1), when viewed

20  in light of Plaintiffs' difficulty with written English, this fact is not dispositive.  Here,

21  Plaintiffs submitted evidence that indicates that passing handwritten notes did not result

22  in effective communication. *See* Dkt. # 15 (Ex. 1 to Aye Decl., Mr. Gough Dep. 20:5-21);

23  Dkt. # 15 (Ex. 4 to Aye Decl., Ms. Gough Dep. 9:20-10:4).  Thus, the court finds that

24  Plaintiffs presented evidence that raises a factual issue regarding the effectiveness of the

25  written notes.

26      St. Joseph also argues that Plaintiffs' claims must be dismissed as a matter of law

27  because it has satisfactorily revised its policy and practice to comply with the anti-

1   discrimination law as evidenced by the findings of the HRC.[16] Dkt. # 14 at 10-11.  St.

2   Joseph failed to cite to, and the court is not aware of, any legal authority that investigative

3   findings, on which the HRC based its decision to close Mr. Gough's case, have binding

4   effect on this court.  In fact, the findings stated that "[t]his Commission action does not

5   preclude the Complainant from filing a civil action in a court of competent jurisdiction …

6   [regarding] the alleged unfair practice." Dkt. # 15 (Ex. 6 to Aye Decl.).  In addition,

7   Plaintiffs provided evidence that on multiple occasions, when St. Joseph's VRI was

8   utilized, it was ineffective due to the "blurry" video image and inadequately trained

9   hospital staff unable to quickly set up the device. Dkt. # 15 (Ex. 1 to Aye Decl., Mr.

10  Gough Dep. at 31:8-11, 32:12-16); # 23 (Mr. Gough Decl.) at 3:14-16.  Plaintiffs also

11  offered evidence that St. Joseph's VRI appears to be incompatible with their particular

12  disability because they cannot see the monitor while laying down, which impedes the

13  interpreter's ability to see the "fingerspellings." Dkt. # 15 (Ex. 1 to Aye Decl., Mr.

14  Gough Dep. at 42:13-22, 43:3-9); # 23 (Mr. Gough Decl.) at 3:11-13.  These alleged

15  violations echo the exact requirements needed to ensure that St. Joseph's communication

16  with Plaintiffs is "effective." *See* 28 C.F.R. § 36.303(f)(1), (2), (3), and (4) (for VRIs, the

17  regulations require "high-quality video images that [are not] choppy, *blurry*, or grainy, ...

18  large enough to display ... the participating individual's face, arms, hands, and fingers,

19  *regardless of his or her body position*," and also require "[a]dequate training ... so that

20  [the staff] may *quickly* ... set up and operate the VRI.") (emphasis added).[17]

---

21  

22  [16] The investigator specifically indicates:  "Respondent as well as the interpreter service it
    contracts with indicated at the time Complainant was a patient it was difficult to get a 'same-day'

23  interpreter. Since the filing of the complaint Respondent has taken immediate action to bring its
    staff in compliance with the law. It has set up a Skype program that will assure 24/7 access to

24  interpreters for its clients. Respondent immediately conducted training for 65 of its first
    responders which included training on the assistive devices for people with hearing and vision

25  impairments."  Dkt. # 15 (Ex. 6 to Aye Decl.).  The HRC investigative findings appear to be a
    negotiated resolution of the HRC complaint that does not address Plaintiffs' specific situation,

26  which further bolsters the court's conclusion that this case should proceed on the merits.
    [17] Plaintiffs also presented evidence that other hearing impaired individuals have had difficulty

27  with St. Joseph's VRI. *See* Dkt. # 22 (Stoops Decl.) at 2:4.

1    St. Joseph also argues that it complied with the ADA as a matter of law because a

2    delay, as opposed to failure, in providing interpreter services does not amount to

3    discrimination. Dkt. # 14 at 10.  The court disagrees.  Discrimination is defined by the

4    ADA, in part, as "a failure to take such steps as may be necessary to ensure that no

5    individual with a disability is … treated differently than other individuals because of the

6    absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).  Here, Plaintiffs

7    produced sufficient evidence, from which a reasonable trier of fact could determine that

8    St. Joseph treated Plaintiffs differently than non-disabled individuals before and after the

9    interpreter was provided.

10   Accordingly, the court finds that Plaintiffs proffered enough evidence to raise a

11   genuine issue of material fact as to whether Plaintiffs were denied full and equal

12   treatment by St. Joseph because of their disability.[18]

13                                         **IV. CONCLUSION**

14   For all the foregoing reasons, Defendant's motion for partial summary judgment is

15   DENIED.  The Clerk of Court is DIRECTED to enter an amended scheduling order with

16   a new trial date of August 19, 2013.

17   Dated this 19th day of March, 2013.

18

19

20   The Honorable Richard A. Jones
     United States District Judge

21

22

23

24

25

---

26   [18] As discussed above, because Plaintiffs have made a sufficient showing of discrimination to
     survive summary judgment on their ADA claim, *a fortiori* Plaintiffs have made a sufficient
27   showing of discrimination under the WLAD as well. *Duvall*, 260 F.3d at 1136, n.10.